IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENT MAYFIELD and
TONYA MAYFIELD,

        Plaintiffs,

v.                                                  Case No. 6:14-cv-01307-JTM

JIM BETHARDS,

        Defendant.

**MEMORANDUM AND ORDER**

Plaintiffs claim that Jim Bethards, a Harvey County Sheriff's Deputy, violated their Fourth Amendment rights by shooting and killing one of their dogs. They seek actual and punitive damages under 42 U.S.C. § 1983. The matter is now before the court on the following: plaintiffs' motion for summary judgment (Dkt. 111); plaintiffs' motion for default judgment and sanctions (Dkt. 115); and defendant's motion for summary judgment (Dkt. 123).

**I. Plaintiffs' Motion for Summary Judgment (Dkt. 111).**

A review of plaintiffs' motion shows that it fails to comply with Rule 56 or with the court's local rules. It contains various factual assertions, none of which are shown to be supported by materials contemplated by Rule 56. The factual assertions are interspersed with legal arguments and, with one or two exceptions, include no references or citations to the record.

Rule 56 provides in part that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be genuinely disputed "must support the assertion by … citing to particular parts of the record, including depositions, … affidavits … or other materials." Fed. R. Civ. P. 56(c)(1)(A). Plaintiffs' motion does not comply with this requirement. As defendant Bethard points out, "[t]here are no statements of fact for him to admit or deny." Dkt. 112 at 4.

If a party fails to properly support an assertion of fact as required by Rule 56, the court may give the party an opportunity to properly support the fact, consider the fact undisputed for purposes of the motion, grant summary judgment if the motion and supporting materials show that the movant is entitled to it, or issue any other appropriate order. Fed. R. Civ. P. 56(e).

The court concludes the appropriate course here is to deny plaintiffs' motion for summary judgment. Although plaintiffs' reply brief (Dkt. 116) attempts to correct the original deficiencies, raising new factual matters and arguments in a reply brief opens the door to yet another round of briefs. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) ("if the court relies on new material or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials"). The court concludes that additional briefing would result in unnecessary delay and expense and that the balance of factors does not warrant re-opening summary judgment briefing. *See* Fed. R. Civ. P. 1 (the rules shall be administered to

secure the just, speedy, and inexpensive determination of the action). Because plaintiffs have failed to show their entitlement to judgment in accordance with the standards of Rule 56, their motion for summary judgment is denied.

**II. Plaintiffs' Motion for Default Judgment and Sanctions (Dkt. 115)**.

Plaintiffs complain that defendant failed to timely serve them with a paper copy of defendant's summary judgment response. Dkt. 115 at 1. They argue this was not a mistake but was "an intentional inadvertence and further excusable neglect." *Id*. at 2. Plaintiffs ask the court "to hold the [defendant's] attorneys in Civil Contempt of Court and to request the appropriate coercive sanctions for failure to comply to the Federal Rules of Procedures." *Id.* at 3.

Defendant essentially concedes that when he electronically filed his response, he did not serve a paper copy on plaintiffs as required by the rules.[1] Dkt. 119. Defendant says that a copy of the brief was emailed to plaintiffs on April 17 after plaintiffs asserted a lack of service, and that plaintiffs were able to file their reply (Dkt. 116) on April 20, 2017. Defendant contends plaintiffs suffered no prejudice from the failure, claims that plaintiffs failed to follow Fed. R. Civ. P. 11(c)(2) in seeking sanctions, and argues that default judgment is not warranted in any event.

The court concludes no sanctions are warranted. First and foremost, plaintiffs point to no legal prejudice from having received the response on April 17th rather than on or around April 4th. Plaintiffs requested no additional time to file their reply brief

---

[1] D. Kan. R. 5.4.9(b) requires the filer to serve paper copies on a party who has not consented to electronic filing.

and ultimately filed it on April 20th. Defendant does not challenge the reply brief as untimely. Plaintiffs thus suffered no harm from the delay. Second, plaintiffs do not say when they first became aware of defendant's response. And third, plaintiffs cite nothing to show that defendant's failure to serve a paper copy was anything other than inadvertent. Plaintiffs' claim that defense counsel has engaged in a pattern of "blatant abuses and violations" is utterly without support.

**III. Defendant's Motion for Summary Judgment (Dkt. 123)**.

A. *Summary Judgment Standards*. Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

B. *Uncontroverted Facts*. Defendant first argues his motion for summary judgment should be granted as uncontested because plaintiffs filed their response ten days

beyond the deadline. Dkt. 129 at 4. The court rejects this argument for essentially the same reasons it rejected plaintiffs' motion for default judgment. Defendant shows no prejudice from this ten-day delay, he makes no showing that plaintiffs acted in bad faith, and such a brief delay does not merit forfeiture of plaintiffs' claims.

A more meritorious argument is that defendant's statement of uncontroverted facts should be deemed admitted by virtue of plaintiffs' failure to properly controvert it. Under the local rules, each fact in dispute must be numbered by paragraph, refer with particularity to the portions of the record relied upon, and state the number of the movant's fact that is disputed. D. Kan. R. 56.1(b)(1). Additionally, facts on which an opposition memorandum is based "must be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for admission." *Id*. at 56.1(d). Plaintiffs' memorandum largely fails to do so. The court understands that plaintiffs are acting *pro se* and may be unfamiliar with the rules of evidence and procedure in federal court, but having chosen to proceed *pro se* they are bound to follow the rules and abide by the consequences if they fail to comply with the rules. The court cannot act as their lawyer, cannot construct arguments on their behalf, and will not search the record for material facts in support of their claim. Under the standards of Rule 56, the court finds the following facts to be uncontroverted for purposes of summary judgment.

Plaintiffs Kent and Tonya Mayfield are residents of Harvey County, Kansas. They reside at 1020 South Hertzler Road, near Halstead, Kansas.

Lisa Stockebrand resides at 1911 S. Hertzler Road near Halstead, Kansas.

5

The area of Hertzler Road where the Mayfields and Stockebrand reside is rural, with few homes. The Mayfield house is about half a mile north of the Stockebrand property. There are only a few residences in between the two.

Carman Clark and Jim Bethards were employed as deputies by Harvey County Sheriff T. Walton.

In August 2013, Lisa Stockebrand's daughter called the Harvey County Sheriff's Office to report that the Mayfields' dogs had entered Stockebrand's property and attacked her livestock. A goat was killed in the attack and a sheep was injured. One of the Stockebrands obtained a firearm and shot at one of the dogs (a white one) as it ran off. Stockebrand described the dogs to a deputy as all-white dog with long hair and a long tail, and a black dog with a tan colored facial area. Stockebrand told a deputy she had previously seen the dogs about a half mile north of their house, at a residence they believed was owned by someone named Mayfield.

In August 2013, deputies with the Harvey County Sheriff's office investigated Stockebrand's claims. A deputy told the Mayfields they should keep their dogs restrained because neighbors believed Stockbrand's claims and were threatening to kill the Mayfields' dogs if they saw them. Also in August 2013, Stockebrand posted multiple threats on Facebook against the Mayfields' dogs.

Prior to July 13, 2014, neither Kent nor Tonya Mayfield had met Deputy Bethards or Deputy Clark, and neither of the deputies had met Lisa Stockebrand.

On July 13, 2014, the Mayields owned three dogs: a white Malamute/Husky named Majka Tikanni; a black dog with brown on her face, chest and tail, named Kira;

6

and a brown German Shepherd named Suka. On the morning of July 13, 2014, the Mayfields left their home at 1020 S. Hertzler Road to travel to Hutchinson, Kansas. They locked their three dogs inside their home. The Mayfields later learned that the three dogs escaped from the house that morning by breaking a window.

On the morning of July 13, 2014, Lisa Stockebrand called the Harvey County Sheriff's Office to report that two dogs, including the Mayfield's white Husky, had attacked and killed her livestock. Upon receiving the call, deputies Bethards and Clark went to Stockebrand's property to investigate. At the scene, Stockebrand described three dogs involved in the attack: a large white Shepherd or Husky mix; a large black dog with a little brown on it; and a brown Shepherd-type with some black on it. Ultimately, four goats and one sheep died as a result of the attack. The livestock belonged to Stockebrand's granddaughter and were 4H show animals. Stockebrand estimates the 2014 attack caused her to suffer losses of more than $1,800.

Stockebrand told deputies Bethards and Clark that her family members were armed and were searching for the three dogs that attacked her livestock. Stockebrand told them she had just seen the dogs leave the property and urged the officers to pursue them.

Bethards and Clark drove south from Stockebrand's place toward Halstead. The deputies noticed neighboring homes with chickens, goats, and horses. According to the deputies, they were concerned the dogs might attack other animals in the area. While driving on a public road, the deputies saw dogs possibly matching the description

given by Stockebrand in the vicinity of what appeared to be an abandoned home near 324 East Street, Halstead, Kansas, 67056.[2]

The home appeared uninhabitable, and no one was present when the deputies arrived. None of the dogs on the property wore a collar, were contained within a fence, or appeared to be under anyone's control. According to the deputies, in light of the reported livestock attack, the presence of other livestock nearby, and the presence of a nearby park, they were concerned that the dogs posed a risk to other people and property.

Deputy Clark had leashes in his patrol car and requested a "catch pole" to assist in securing the dogs. The two deputies approached the home, with Bethards carrying a department-issued rifle. They first encountered a brown dog with black on it. It was laying down in the driveway, was not wearing a collar, and did not appear to have any blood on it. The dog did not behave aggressively and ran away. The deputies encountered a second dog, which was black with a bit of brown fur. That dog also ran off. The deputies encountered a third dog, a white Husky, on the south porch of the dilapidated home. They approached it and saw what appeared to be blood on the back of its neck. As they approached, the dog turned and charged at them. Bethards fired two or three shots, but could not shoot directly at the dog because Clark was in his line of fire. The dog ran around to the north side of the house and the deputies pursued it. When they approached the dog again on the north porch, it snarled, showed its teeth,

---

[2] The actual address of the home is not clear. Defendant suggests it is likely 233 East Street. Dkt. 124 at 10, n.1. Whether the correct address is 324 or 233 is not material for purposes of the instant motion.

and barked in an aggressive manner. According to the deputies' affidavits, the dog "attacked us again." Bethards fired two more times, hitting and killing the dog on or near the porch of the residence.

Bethards' affidavit states that he intended to transport the dog to the local humane society for cremation, but because of the amount of blood he did not want to put it in his patrol car. He dragged it to a nearby tree line. He states that he intended to retrieve it later with another vehicle. Bethards also states he intended to clean the blood off the porch but could find no running water, so he spread dirt over the blood to keep away flies and scavenging animals.

The dog that Bethards killed was the Mayfields' Malamute/Husky, Majka Tikanni. The Mayfields had originally paid between $100 and $275 to acquire Majka. The Mayfields generally allowed their dogs, including Majka, to run freely without a collar, leash, or other restraint. There was no "lease law" in this area, which was outside the city of Halstead.

Kent and Tonya Mayfield did not own the property Mijka where was shot. According to deposition testimony, that property was owned by Kent Mayfield's aunt. The Mayfields previously lived in the house on the property but have not lived there since 2007. The Mayfields have a recreational vehicle parked on the property that they sometimes use. The property is located in a rural area just north of Halstead, about a mile southwest of the Stockebrand property, with only one or two residences in between the two properties.

9

C. *Discussion*.

1. <u>Issues on summary judgment</u>. Plaintiffs claim Bethards' shooting of their dog violated their rights under the Fourth Amendment. Dkt. 117 at 13. It bears pointing out that this is the only claim set forth in the Pretrial Order, and notwithstanding plaintiffs' various arguments in their briefs about the officers "trespassing" or unlawfully searching on their property, the only claim properly asserted is that Bethards' shooting of the dog was an unreasonable seizure.

In his motion for summary judgment, defendant argues it was not unreasonable under the Fourth Amendment to shoot a dog that was attacking the deputies, particularly (he argues) when the dog was allowed to run loose, when it presented a danger to other animals, and when there was a threat to public safety because the dog could attack other persons and there was a potential for conflict between armed members of the Stockebrands and the Mayfields. Defendant also contends the killing of the dog was lawful under K.S.A. § 47-646. Additionally, he argues he is entitled to the defense of qualified immunity because there was no clearly established law precluding an officer from killing a dog under the circumstances he faced.

Defendant also seeks summary judgment as to damages, arguing the *pro se* plaintiffs cannot recover attorney fees, that they can obtain no more than $275 in actual damages, and that their claim for punitive damages is unsupported by evidence that defendant's conduct was motivated by evil motive or intent.

2. <u>Fourth Amendment standards</u>. The Fourth Amendment to the U.S. Constitution protects the right of people to be secure in their effects against

unreasonable seizures. As the Tenth Circuit noted in the previous appeal, dogs are considered personal property under Kansas law and are "effects" within the meaning of the Fourth Amendment. Moreover, killing a dog qualifies as a seizure because it meaningfully interferes with the owner's possessory interest. An officer's killing of a dog "therefore constitutes a violation of the owner's Fourth Amendment rights absent a warrant or some exception to the warrant requirement." *Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016).

The Supreme Court has found that "[w]hen faced with special law enforcement needs, diminished expectations of privacy, [or] minimal intrusions … circumstances may render a warrantless search or seizure reasonable." *Maryland v. King*, 133 S.Ct. 1958, 1969 (2013) (citations omitted). When a seizure occurs without a warrant, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). "Even if a warrant is not required, a [seizure] is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution." *King*, 133 S.Ct. at 1970.

The killing of a dog is a significant intrusion on the owner's interests, and thus weighs against a finding of reasonableness when it occurs without a warrant. *Kendall v. Olsen*, 2017 WL 664024, *6 (D. Utah Feb. 2, 2017).[3] "On the other side of the equation is officer safety, also a weighty concern." *Id*. This factor recognizes that some dogs may

---

[3] As *Kendall* noted, most dog owners "think of dogs solely in terms of an emotional relationship, rather than a property relationship." *Kendall*, 2017 WL 664024, at *6 (cite omitted).

11

attack people and "maim or even kill." *Id*. Because of that potential, "and because officers are often forced to make split-second judgments about the threat a particular dog poses, [officers'] ability to effectively protect themselves also weighs heavily in the reasonableness calculus." *Id*. A thorough discussion of relevant cases in *Branson v. Price*, No. 13-cv-3090-REB, 2015 WL 5562174, *5 (D. Colo. Sept. 21, 2015) identified the following relevant factors to consider: (1) whether the dog was "at-large" or whether the owner was available and willing to assert control over the dog; (2) the breed of the dog; (3) whether there was time to find an alternative to gain control of the dog; (4) whether non-lethal means were available to control the dog; and (5) whether the dog posed a danger to the officer or the public.

According to *Kendall*, cases have coalesced around the following standard for an officer's killing of a dog:

> Courts have found a balance between the rights of dog owners and the interests of officer safety by implementing a simple rule: an officer's killing of a dog is reasonable only if the dog poses an "imminent threat." Whether a dog poses an imminent threat is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." In other words, the question is not whether the dog, in retrospect, actually posed an imminent threat, but instead whether a reasonable officer on the scene would perceive it that way.

*Id*. at *6. *See also Sonnier v. Ackal*, No. 6:16-CV-00621, 2017 WL 3080023, at *3 (W.D. La. June 29, 2017), *report and recommendation adopted*, No. 6:16-CV-00621, 2017 WL 3045945 (W.D. La. July 18, 2017); *Branson*, 2015 WL 5562174 at, *6 ("clearly established law held that it is unreasonable for law enforcement to kill a pet dog when the dog did not present an imminent threat to law enforcement or the public").

12

3. <u>Community caretaking function</u>. Case law also recognizes that police officers "are expected to perform functions apart from criminal investigations, including 'preventative patrol and other measures, aid[ing] individuals who are in danger of physical harm, assist[ing] those who cannot care for themselves, resolv[ing] conflict, creat[ing] and maintain[ing] a feeling of security in the community, and provid[ing] other services on an emergency basis.'" *Arden v. McIntosh*, 622 F.App'x 707, 709 (10th Cir. 2015) (quoting *United States v. Najar,* 451 F.3d 710, 715 (10th Cir. 2006)). *See also United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (community caretaking includes activities undertaken to help those in danger and protect property). Such "community caretaking functions" are police actions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Arden*, 622 F.App'x at 709 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). A warrantless seizure may be justified when an officer is acting in a community caretaking role if the seizure is based on specific and articulable facts that reasonably warrant an intrusion into an individual's liberty or property interest, and the government's interest outweighs the individual's interest in being free from arbitrary governmental interference. *Cf. Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012) (finding community caretaker exception did not permit arrest during a domestic dispute); *Quezada*, 448 F.3d at 1007 (officer may enter residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention).

4. <u>Qualified immunity</u>. The court need not determine in this instance whether, under the foregoing standards, Bethards' seizure of Majka violated plaintiffs' Fourth Amendment rights. Even assuming it did, for the following reasons the court concludes that Bethards is entitled to judgment based on qualified immunity.

"Qualified immunity protects public officials who are required to exercise their discretion, shielding them from personal liability for civil damages." *Apodaca v. Raemisch*, ___F.3d___, 2017 WL 3138361, *2 (10th Cir., July 25, 2017). The defense is available insofar as an officer's conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. The relevant question is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation. *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (citation and internal quotation marks omitted).

In this context, "clearly established law" must be "particularlized to the facts of the case" and "should not be defined at a high level of generality." *Johnson v. Peay*, ___F.App'x___, 2017 WL 3273335, *3 (10th Cir. Aug. 1, 2017) (citing *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (internal quotation marks omitted)). That is especially true in the context of the Fourth Amendment, where it may be difficult for an officer to determine how the law will apply to the factual situation confronted. *Johnson*, at *3 (citation

14

omitted). When a case presents a unique set of facts and circumstances, this quality can be an important indication that the officer's conduct did not violate a clearly established right. *Id*. (citing *Pauly*, 137 S.Ct. at 552)). "That is, when there is no case 'where an officer acting under similar circumstances … was held to have violated the Fourth Amendment,' it is unlikely that the officer's conduct violated 'clearly established' law." *Id*.

Under the uncontroverted facts before the court, Bethards did not violate plaintiffs' clearly established constitutional rights. Bethards was sent to the Stockebrands' property and given information indicating that several dogs, including one identified as, and plainly matching the description of, the Mayfields' dog (Majka) had only minutes before attacked and killed some of the Stockebrands' livestock. Lisa Stockebrand indicated the dogs had just left her property and that members of her family were armed and looking for them. None of this amounted to a criminal offense, but the prospect of armed conflict between neighbors with a history of bad blood and the potential for additional damage to persons or property made it reasonable for Bethards to intervene in a community caretaking role and to prevent armed conflict, in part by attempting to seize the dogs involved in the attack before the Stockebrands attempted to shoot them.

The officer's intervention was reasonable in part because of Kansas law (K.S.A. § 47-646), which allows a person to shoot a trespassing dog which he finds on his premises injuring livestock, or to do so "within a reasonable time thereafter." Under the latter provision, the person can "pursue such dog after it has left his premises, and …

15

shoot … such dog off his premises." *Mayfield*, 826 F.3d at 1257 (citing *McDonald v. Bauman*, 199 Kan. 628, 433 P.2d 437 (1967)). If the dog returns to its owner's property, Kansas law provides that the person has a right to shoot the dog if doing so is justified and the person entered the dog owner's land with authority. *Id*. As the Tenth Circuit noted, Kansas cases have not addressed the killing of a dog on its owner's property by a police officer acting in response to a complaint of a livestock attack. *Mayfield*, 826 F.3d at 1257, n.5. Bethards was thus confronted with the prospect of a violent confrontation between the Stockebrands, who were armed and angry, and the owners of the dogs. He was also confronted with a state law granting a qualified privilege to shoot a dog, but the precise parameters of the law had not been developed.

Bethards began a search and quickly found dogs apparently matching the description on a nearby property. The dwelling on the property appeared to be uninhabitable, no one was present at the property, and the dogs were roaming free. Bethards was aware of other livestock in the area, as well as a public park, and thus had reason to be concerned about the threat the dogs posed to other livestock or, potentially, to persons in the area, as well as reason to be concerned about the potential for conflict or danger posed by the Stockebrands' search for the dogs. Plaintiffs contend that Bethards' entry onto the property for the purpose of seizing the dogs was itself a violation of their Fourth Amendment rights. But plaintiffs made no such legal claim in the Pretrial Order. Nor have they shown their basis for claiming a legitimate expectation of privacy in the property, except to assert that the property was owned by a relative and they sometimes used it. *Cf. Minnesota v. Olson*, 495 U.S. 91, 99 (1990)

(entry into home violated rights of overnight guest of owner). At any rate, plaintiffs cite no case showing that Bethards' entry onto the property violated their clearly established Fourth Amendment rights.

It is uncontroverted that one of the deputies had made a request for a catch pole, although nothing is cited to show when the pole was requested, from whom, or how long it would take to have it delivered to Bethards' location. Given these unknown circumstances, Bethards might be faulted for not waiting and attempting a less intrusive seizure. But at the same time, plaintiffs cite no case law establishing that Bethards' decision to proceed and to arm himself with a rifle as he confronted three potentially dangerous and unrestrained dogs was contrary to clearly established law, particularly given the prospect of armed involvement by the Stockebrands. Once on the property, Bethards (and Clark) saw Majka and saw blood on her. This uncontroverted fact – as well as every other bit of information the officers had – confirmed that Majka was likely involved in the attack on the Stockebrands' livestock. The officers had clear reason at that point to believe this dog was involved and to believe it was potentially vicious. They also knew there were other livestock and a public park in the vicinity. Plaintiffs cite no case law showing that an officer's seizure of a dog in similar circumstances violated the Fourth Amendment.

Bethards had no opportunity to appeal to the dog's owner for help in corralling it, as there was no one present. The dog, which was clearly of consequential size, wore no collar and roamed unconstrained. There was good reason to believe it had just attacked and killed or wounded a number of animals. It is an uncontroverted fact that

Majka exhibited aggressive behavior and came at the officers when they first approached, prompting Bethards to fire several shots in its direction. When the dog went around the house, the officers pursued it and Bethards fatally shot the dog after it again exhibited aggressive behavior. Regardless of whether Bethards' conduct could be found unreasonable under the factors in *Branson*, *supra*, plaintiffs fail to cite case law showing it was clearly established at the time that such conduct was unlawful. Case law allows officers to use deadly force to protect themselves against an aggressive dog that poses an imminent threat. *See Kendall v. Olsen*, 2017 WL 664024, *6 (D. Utah Feb. 2, 2017) (citing cases). *Cf. Grant v. City of Houston*, 625 F. App'x 670, 676–77 (5th Cir. 2015) (statutes establishing procedure for determining whether a dog was dangerous did not inhibit officer's right to use deadly force to protect himself from the threat of serious bodily harm). "[A]n officer need not wait to be mauled or attacked before employing force in self-defense." *Kendall*, at *8. Regardless of whether hindsight suggests Bethards could have retreated or could have attempted the use of lesser force, the uncontroverted facts show he had a plausible basis for perceiving an imminent threat to his safety. *Smith v. City of Detroit*, No. 16-11882, 2017 WL 3279170, at *8 (E.D. Mich. Aug. 2, 2017) (The court objectively evaluates whether a dog constitutes an imminent threat from the perspective of a reasonable police officer at the time of the incident, without the benefit of hindsight.). Plaintiffs have failed to show that his conduct violated clearly established law.

Plaintiffs make several arguments against this conclusion but they are unavailing. For example, plaintiffs contend it is unlikely that Majka charged the officers,

as they claim, because she was not an aggressive dog. But plaintiffs' speculation as to the dog's behavior cannot create a genuine issue of fact. *See Kendall*, 2017 WL 664024, *7 ("A reasonable responding officer would not be expected to know anything about [plaintiff's] dog's history…."). Plaintiffs also argue based on pictures of the porch and the dog that "Bethards shot Majka as she was side ways to him behind a refrigerator…." Dkt. 127 at 6. Aside from the fact that the pictures (Plaintiffs' Exhibit C) are not authenticated, plaintiffs' interpretation of the photographs again requires unsupported speculation and fails to provide information about whether the dog posed a threat at the moment it was shot. *Smith v. City of Detroit*, No. 16-11882, 2017 WL 3279170, at *10 (E.D. Mich. Aug. 2, 2017) ("In order to survive summary judgment, there must be a 'discrepancy between the dog owner's version of events and the officers' testimony' that goes 'directly to whether the dog was an imminent threat to the safety of the officers.'"). Plaintiffs have pointed to no such discrepancy. Plaintiffs also argue that Bethards is trying to contravene the Tenth Circuit's previous ruling. The Tenth Circuit denied Bethards' defense of qualified immunity based on the allegations in the complaint. *Mayfield*, 826 F.3d at 1256 ("[a]lthough Deputy Bethards could present evidence that might succeed at summary judgment or trial, at the motion-to-dismiss stage our review is limited to the sufficiency of the allegations in the Complaint."). In the instant motion, the court makes its determination based on the uncontroverted facts. Under those facts, plaintiffs have failed to establish that Bethards violated clearly established law.

"Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S.Ct. at 308. Bethards was

confronted here with a community caretaking responsibility that required him to seize dogs that had attacked livestock, prevent a potential armed conflict between the livestock owner and the dog owner, and face an aggressive and unrestrained dog that was not under anyone's control. Plaintiffs have not shown that his response to the situation was a violation of clearly established law.

**IT IS THEREFORE ORDERED** this 30th day of August, 2017, that plaintiffs' Motion for Summary Judgment (Dkt. 111) and Motion for Default Judgment and Sanctions (Dkt. 115) are DENIED; defendant Jim Bethards' Motion for Summary Judgment (Dkt. 123) is GRANTED.

 ___s/ J. Thomas Marten_____
 J. THOMAS MARTEN, JUDGE